IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

*DO 88*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 24-86 |
| | ) | |
| v. | ) | (18 U.S.C. §§ 2, 1347(1), |
| | ) | 1035(a)(2), 1957(a)) |
| KELLEY OLIVER-HOLLIS | ) | [UNDER SEAL] |

## INDICTMENT

### COUNT ONE

The grand jury charges:

**FILED**

**APR 1 6 2024**

### GENERAL ALLEGATIONS

CLERK U.S. DISTRICT COURT
WEST DIST OF PENNSYLVANIA

Unless otherwise indicated, at all times material to this Indictment:

**A.     The Medicaid Program**

1.      The Social Security Act of 1965 ("SSA"), codified at Title 42 U.S.C. § 301 et. seq.,
defines a Federal health care program as "any plan or program that provides health benefits,
whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by
the United States Government" or "any State health care program, as defined in section 1320a–
7(h) of this title." 42 U.S.C. § 130a-7b(f).

2.      Medicaid was a federal "health care benefit program," as defined by Title 18,
United States Code, Section 24(b), co-funded by federal and state governments, that provided
medical assistance for indigent individuals who are aged, blind, disabled, or members of families
with dependent children.

3.      In the Commonwealth of Pennsylvania, Medicaid was administered by the
Pennsylvania Department of Human Services ("DHS") through the Pennsylvania Medical
Assistance Program (PMAP).

4.      PMAP, commonly known as "Medicaid," was a joint State/Federal program that purchased health care for low-income individuals and others with certain disabilities who are Pennsylvania residents.  PMAP was administered by the Office of Medical Assistance Programs (OMAP) within the DHS.   PMAP was funded through a combination of Pennsylvania state and federal funds.

5.      PMAP required that covered or insured individuals receive approved services from a Medicaid-enrolled provider (hereafter "Provider") within the scope of the Provider's license and in accordance with all state and federal requirements.

6.      To become a PA Medicaid Provider, an entity was required to submit an appropriate enrollment application along with certain required documentation. As part of the application process, the Provider agreed, among other things, (a) to comply with all applicable state and federal laws, regulations, and policies governing the participation in PMAP, (b) to maintain documentation of the services rendered to covered or insured individuals, and (c) to certify for each submitted PMAP claim that the services or items for which payment is claimed were actually provided by the Provider to the covered or insured individual identified in the claim.

7.      As a condition of payment, and pursuant to the provider's enrollment applications and provider agreements, by regulation, a provider such as Serenitycare was prohibited from submitting a fraudulent claim for false information for services for the purpose of obtaining greater compensation than that to which the provider is legally entitled for furnishing services.

B.      **The Home and Community-Based Services Waiver Program**

8.      The "Home and Community-Based Services Waiver Program" (HCBS or the Program) was a PMAP program authorized by Section 1915(c) of the Social Security Act, 42

2

U.S.C. § 1396n(c), and administered by PA Medicaid through DHS' Office of Long-Term Living ("OLTL") and Office for Developmental Programs ("ODP").

9.     The HCBS allowed qualified individuals covered or insured by PA Medicaid to receive certain home and community-based services designed to enable an individual to continue residing at a home and in a community and, as such, to avoid institutionalization.  To that end, the HCBS Program permitted participating states, including the Commonwealth of Pennsylvania, to obtain a waiver of the federal Medicaid rules that might otherwise require institutional care as a basis for Medicaid coverage and reimbursement.

10.     Pennsylvania had broad discretion to design its HCBS Program to address the needs of its target population, and to enable individuals to remain in the community rather than being admitted to a nursing home or other long-term care facility.

11.     For purposes of the HCBS Program, insured or covered individuals who are entitled to services are referred to as "residents."

12.     HCBS services included, among other things, that the Provider provide direct care workers to assist the residents with various daily living activities in the resident's home, including, bathing, dressing, light cleaning, meal and medication preparation, and other non-medical household chores.

13.     All residents of the HCBS Program with intellectual disabilities must initially be evaluated for adaptive skills and behaviors by a team of qualified personnel, including Program specialists, medical doctors, service coordinators, and the Provider in accordance with an individual assessment or service plan (hereafter, "ISP").  The assessment of the resident must occur within 90 days prior to the individual residing in a home and must be reviewed at least annually.

14.     The ISP must include an evaluation of the appropriate care services required for the resident's "daily needs," such as, the resident's strengths, functional abilities and service needs, the resident's preferences related to relationships, communication, community participation, employment, income and savings, health care, wellness and education.  Also evaluated were services to assist the resident to achieve desired outcomes, risks to the resident's health, safety or well-being, behaviors likely to result in immediate physical harm to the individual or others and risk mitigation strategies and, if applicable, any modifications of individual rights as necessary to mitigate significant health and safety risks to the individual or others.

15.     Critical to the determination of an appropriate level of care for the resident was a determination of the need for 24-hour supervision and adequate staffing by care workers for the resident at the residence based upon the resident's functional and intellectual disabilities.

16.     The HCBS Program staffing requirements mandated that the Provider ensure staff qualifications and staff-to-resident ratio match those required as specified in the ISP, provide orientation and annual training for service workers, and maintain records certifying the same.

17.     The Provider was also required to provide "home services" to the resident in accordance with the resident's ISP, which generally included educational training and support, maintenance or improvement of functional skills, personal needs, communication and personal adjustment, in addition to creating opportunities and providing support to the individual for participation in community life which are age and functionally appropriate for the individual.

18.     In Pennsylvania, the HCBS Program was managed by the ODP, which oversaw Providers to ensure that proper care was provided to the resident.  ODP also would periodically perform audits of the Provider.

19.     Upon completion of services to the resident in accordance with the Program regulations, the Provider could then submit an electronic claim for benefits to PMAP.

## RELEVANT ENTITIES

20.     Serenitycare LLC (hereafter, "Serenitycare" or "Agency"),was a Pennsylvania limited liability for-profit company which operated residential and community-based homes for residents with intellectual disabilities in accordance with the HCBS. The registered business address for Serenitycare was 8620 Frankstown Road, Pittsburgh, PA 15235.  At all times hereto, Serenitycare provided community residential habilitation services under the HCBS.

21.     At all times relevant hereto, the defendant, KELLEY OLIVER-HOLLIS (hereafter, "OLIVER-HOLLIS") was an owner of Serenitycare which was an enrolled Medicaid Provider under the HCBS Program.

22.     On or about December 16, 2016, defendant OLIVER-HOLLIS, as an owner and authorized agent, on behalf of Serenitycare, executed a Provider agreement with PMAP to provide outpatient services under the HCBS Program.  The application contained a certification stating that the Provider "shall comply with all applicable State and Federal laws, regulations, and policies which pertain to participation in the Pennsylvania Medical Assistance Programs."

23.     As the managing owner for the Provider Serenitycare, defendant OLIVER-HOLLIS was responsible for ensuring that residents in the Program received services in accordance with the requirements of the Program, including appropriately staffing the homes with direct care workers consistent with the requirements of the resident's ISP.  As such, defendant OLIVER-HOLLIS was chiefly responsible for hiring direct care workers, scheduling direct care workers, communicating with the resident's service coordinator, county authorities and ODP,

participating in the creation of the resident's ISP, and billing PMAP for services provided to the resident.

24. Service Coordinators' organizations which provided services to the residents such as "Family Links," "Service Coordination Unlimited Inc.," among others, were responsible for participating in the development of a service plan or ISP for the resident, to ensure positive outcomes by meeting periodically with the Provider and resident, to ensure that the resident's services were being delivered in the type, scope, amount, duration and frequency as required by the resident's service plan.

25. Serenitycare operated seven (7) residential homes housing residents located in the East Hills of Pittsburgh at the following locations: 723 Gaywood Drive, Penn Hills, PA 15235; 1436 Sloan Avenue, Wilkinsburg, PA 15221; 221 Trowbridge Street, Pittsburgh, PA 15207; 4701 Monongahela St.; 4703 Monongahela Street, Pittsburgh, PA 15207; 349 Highland Road, Penn Hills, PA 15235, and 159 Eymard Street, Pittsburgh, PA 15221. Serenitycare also maintained a day center called the "Hope Center" located at 7901 Dollman Road in Pittsburgh, PA where residents received community-based job training and activities.

26. During the indictment period, Serenitycare housed in its residential homes approximately 11 residents with intellectual, physical and emotional disabilities who were qualified to receive services under the HCBS Program.

<u>**The Scheme and Artifice to Defraud**</u>

27. The United States incorporates herein by reference the allegations contained in paragraphs 1 through 26 as though set forth more fully herein.

28. From in and around December 2016, and continuing thereafter until in and around July 2023, in the Western District of Pennsylvania, the defendant, KELLEY OLIVER-HOLLIS,

did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program as defined by Title 18, United States Code, Section 24(b), namely the PMAP, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by or under the control of such health care benefit program, in connection with the delivery of, and payment for, health care benefits and services.

29.    It was first a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS applied as a Provider in the PMAP HCBS Program, well knowing that she did not have the qualifications to operate and to manage the Program.

30.    It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS instead identified a person known to the Grand Jury as JOH as the Chief Executive Officer of Serenitycare, and continued to utilize JOH in an executive and managing role even after JOH was convicted of felony distribution of illegal narcotics.

31.    It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS falsely represented on PMAP Applications that JOH did not have any prior felony convictions, which, if disclosed, would have barred JOH from continuing in JOH's role at Serenitycare.

32.    It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS purposefully selected certain residents or "clients" for the Serenitycare HCBS Program who, due to intellectual or emotional disabilities, required higher levels of staff-to-resident ratios, so as to maximize billing rates for services.

33.    It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS then applied for approval to qualify residents as "needs exception allowance" residents in order to claim an even higher billing rate for services for the resident.

34.     It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS knowingly prepared staff-to-resident direct care worker schedules for residents that reflected worker staffing ratios below the required ratios mandated by the resident's ISP and "needs exception allowance".

35.     It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS failed to adequately train direct care workers in the proper care of residents, and failed to keep adequate records which reflected that workers were properly trained.

36.     It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS allowed the residents' homes to fall into a state of disrepair, and not be habitable for the residents.

37.     It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS failed to adequately manage the operation of Serenitycare so that the residents' health, safety, and wellbeing were met in accordance with professionally recognized standards of care.

38.     It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS failed to keep proper financial records for the additional state or federal benefits received by residents, such as SSI and economic impact payments, which would have disclosed how the funds were used for the benefit of the residents.

39.     It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS, as the representative payee for SSI disability payments for residents, withheld payments of SSI benefits to residents as a method of punishment.

40.     It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS instructed care workers to falsify or to "backdate" medication records for residents and allowed untrained care workers to administer medications to residents.

41.     It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS failed to maintain proper record keeping of the services provided to residents including healthcare records, training records, financial records, and certifications.

42.     It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS failed to alert County authorities, ODP, or service coordinators that Serenitycare lacked sufficient direct care workers to staff the resident homes in accordance with ISP requirements, which caused direct care workers to staff residences for longer than the scheduled shift, which entitled them to overtime payments, and which placed the residents and case workers at risk of harm.

43.     It was further a part of the scheme and artifice to defraud that defendant OLIVER-HOLLIS submitted weekly false and fraudulent electronic fee-for-service claims to PMAP, which falsely represented that Serenitycare staffed the resident homes in accordance with the ISP, well knowing that the residents did not receive care in the required staffing ratio, which caused an overpayment of PMAP benefits to Serenitycare in excess of $2 million dollars.

In violation of Title 18, United States Code, Sections 1347(1) and 2.

## COUNTS TWO THROUGH TWENTY-EIGHT

The grand jury further charges:

44.     Paragraphs 1 through 26 and 29 through 43 are hereby incorporated by reference as if re-alleged herein.

45.     On or about the dates set forth below, in the Western District of Pennsylvania, the defendant, KELLEY OLIVER-HOLLIS, as owner of Serenitycare, in a matter involving a health care benefit program, and in connection with the delivery of or payments for health care benefits, items, or services, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and did knowingly and willfully make materially false writings or documents, knowing the same to contain materially false, fictitious, and fraudulent statements, to wit, the defendant, KELLEY OLIVER-HOLLIS, did knowingly and willfully submit false and fraudulent claims for health care benefits to PMAP in order to obtain fees for services provided to the specific residents identified below by initials, for the respective time periods, each such claim being a separate count herein:

| COUNT | CLAIM FILED DATE | CLAIM PERIOD | RESIDENT |
|---|---|---|---|
| 2 | 12-15-2019 | 12-08-2019 to 12-14-2019 | A.J. |
| 3 | 12-15-2019 | 12-08-2019 to 12-14-2019 | H.R. |
| 4 | 6-28-2020 | 06-21-2020 to 06-27-2020 | D.W. |
| 5 | 6-28-2020 | 06-21-2020 to 06-27-2020 | B.D. |
| 6 | 12-21-2020 | 12-13-2020 to 12-19-2020 | C.V. |
| 7 | 12-21-2020 | 12-13-2020 to 12-19-2020 | H.R. |
| 8 | 12-21-2020 | 12-13-2020 to 12-19-2020 | A.J. |
| 9 | 12-21-2020 | 12-13-2020 to 12-19-2020 | D.W. |
| 10 | 07-19-2021 | 07-11-2021 to 07-17-2021 | A.J. |
| 11 | 07-19-2021 | 07-11-2021 to 07-17-2021 | H.R. |
| 12 | 07-19-2021 | 07-11-2021 to 07-17-2021 | C.V. |
| 13 | 02-21-2022 | 02-14-2022 to 02-20-2022 | A.J. |
| 14 | 02-28-2022 | 02-21-2022 to 02-27-2022 | M.B. |

| 15 | 02-28-2022 | 02-21-2022 to 02-27-2022 | A.J. |
| 16 | 02-28-2022 | 02-21-2022 to 02-27-2022 | S.S. |
| 17 | 6/14/2021 | 06-06-2021 to 06-12-2021 | C.V. |
| 18 | 6/14/2021 | 06-06-2021 to 06-12-2021 | S.S. |
| 19 | 6/14/2021 | 06-06-2021 to 06-12-2021 | H.R. |
| 20 | 6/14/2021 | 06-06-2021 to 06-12-2021 | A.J. |
| 21 | 5/17/2021 | 05-09-202 to 05-15-2021 | C.V. |
| 22 | 5/17/2021 | 05-09-202 to 05-15-2021 | S.S. |
| 23 | 5/17/2021 | 05-09-202 to 05-15-2021 | H.R. |
| 24 | 5/17/2021 | 05-09-202 to 05-15-2021 | A.J. |
| 25 | 10/11/2021 | 10-03-2021 to 10-09-2021 | C.V. |
| 26 | 10/11/2021 | 10-03-2021 to 10-09-2021 | S.S. |
| 27 | 10/11/2021 | 10-03-2021 to 10-09-2021 | M.B. |
| 28 | 10/11/2021 | 10-03-2021 to 10-09-2021 | A.J. |

In violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

## COUNTS TWENTY- NINE THROUGH THIRTY-THREE

The grand jury further charges:

46.    Paragraphs 1 through 45 are hereby incorporated by reference as if re-alleged herein.

47.    On or about the dates set forth below, in the Western District of Pennsylvania, the defendant, KELLEY OLIVER-HOLLIS, did knowingly engage and attempt to engage in monetary transactions affecting interstate commerce in criminally derived property with a value greater than $10,000, which property was derived from a specified unlawful activity, that is, as set forth below, the defendant, KELLEY OLIVER-HOLLIS, did cause the withdrawal, deposit, and transfer of monetary instruments identified below, such property having been derived from a specified unlawful activity, that is, Health Care Fraud, in violation of Title 18, United States Code, Section 1347, in a scheme to defraud a health care benefit program as alleged in Count One, each such monetary transaction being a separate count herein:

| Count | Date | Monetary Transaction | Amount |
|-------|------|---------------------|--------|
| 29 | 8/6/2020 | ck. #2726 from KOH[1] PSECU[2] acct. #0185 to Richard Reid | $100,000.00 |
| 30 | 6/25/2021 | Wire transfer from KOH PSECU acct. #8984 to Chicago Title Ins. | $107,900.00 |
| 31 | 12/19/2021 | ck.# 1057 from Serenity BOA[3] acct. #6449 to KOH BOA #9793, re "bonus" | $25,000.00 |
| 32 | 10/1/2022 | ck. #1273 from Serenity BOA acct. #6449 to KOH PSECU acct. #8984 | $50,000.00 |
| 33 | 10/5/2022 | ck. #1278 from Serenity BOA acct. #6449 to KOH PSECU acct.#8984 | $50,000.00 |

In violation of Title 18, United States Code, Section 1957(a).

---

[1] Defendant Kelley Oliver Hollis
[2] Pennsylvania State Employee Credit Union
[3] Bank of America

## FORFEITURE ALLEGATIONS

1.      The United States hereby gives notice to the defendant charged in Counts Numbers 1-33 that, upon her conviction of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Sections 982(a)(7 and 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, including, but not limited to, the following described property:

MONEY JUDGMENT

a sum of money equal to $2,117,313 in United States currency, representing the amount of proceeds obtained as a result of the offense.

2.      If any of the property described above, as a result of any act or omission of the defendant:

|  |  |
|---|---|
| a) | cannot be located upon the exercise of due diligence; |
| b) | has been transferred or sold to, or deposited with, a third party; |
| c) | has been placed beyond the jurisdiction of the court; |
| d) | has been substantially diminished in value; or |
| e) | has been commingled with other property which cannot be divided without difficulty, |

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

13

All pursuant to Title 18 United States Code, Sections 982(a)(1) and 982(a)(7) and Title 28

United States Code, Section 2461(c).

A True Bill,

FOREPERSON

ERIC G. OLSHAN
United States Attorney
IL ID No. 6290382

GREGORY C. MELUCCI
Assistant United States Attorney
PA ID No. 56777

14